Western Mutual Insurance Company, appellant, v. Milton Baldwin and Chicago, Burlington & Quincy Railroad Company, appellees.

No. 51849.

(Reported in 137 N.W.2d 918)

NOVEMBER 16, 1965.

REHEARING DENIED JANUARY 11, 1966.

Bannister, Carpenter, Ahlers & Cooney, of Des Moines, for appellant.

William H. Mecham, of Omaha, Nebraska, and LaVon E. Billings, of Red Oak, both for appellee Milton Baldwin.

Pryor, Riley, Jones & Walsh, of Burlington, for appellee Chicago, Burlington & Quincy Railroad Company.

SNELL, J.—This is an action in equity for declaratory judgment wherein plaintiff insurance carrier seeks relief from contractual liability because of breach of policy conditions, lies and what the dictionary defines as bribery.

The trial court found and we agree that there is no substantial controversy in the evidence.

Plaintiff is a mutual insurance company authorized to do business in Iowa.

Defendant Baldwin is a resident of Red Oak. He owns a farm a short distance southwest of Red Oak. The right-of-way of defendant Chicago, Burlington & Quincy Railroad Company adjoins the Baldwin land on the north. Adjacent to the Baldwin land and as a part of the railroad right-of-way is a bridge spanning the Nishnabotna River.

In April 1962 plaintiff issued to defendant Baldwin its "Farmer's Comprehensive Personal Liability Policy." Coverage "L" of this policy insured defendant Baldwin against personal legal liability up to $25,000 and contained the usual obligation to defend.

Condition 5 of the policy provided:

"Assistance and Cooperation of the Insured—Coverage L. The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits, and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured. shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident."

Condition 8 of the policy provided:

"Action Against Company—Coverage L. No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

"Any person or organization or the legal representative

thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder."

It now appears from the testimony of defendant Baldwin, and accepted as a fact by all parties, that in the early afternoon on March 23, 1963, Baldwin went to his farm and started a fire to burn off weeds and trash so that it could be seeded. The fire was started in a sheltered area at the south end of the farm. Baldwin watched the fire for about two hours as it burned over the fields toward the northeast and to the railroad right-of-way. As the fire spread to the open field north of where it was started the rate of burning increased. Baldwin attempted to follow the fire in his car across his corn ground but became stuck. The house on the farm was occupied by Mr. Dale Meek. Baldwin walked to the house, sought and obtained Meek's help in freeing his car. Meek testified that Baldwin, during their conversation, said " 'Looks like I started quite a fire.' "

Baldwin left to watch "a tremendous flock of geese" on a neighbor's farm and then drove north to the railroad right-of-way where the fire was burning within 100 yards of the bridge. After watching five to ten minutes Baldwin returned to his store in Red Oak. Some time later he learned that the bridge was on fire. He returned to the fire, observed with consternation the damage, and then went to see Mr. Meek. Baldwin told Meek not to tell that he, Baldwin, was even at the farm. During plaintiff's subsequent investigation of the fire, Meek, in a statement, followed Baldwin's instructions.

The railroad's claim for damage to its bridge was $53,790.

Baldwin reported the fire to plaintiff's insurance agent. An employee of plaintiff investigated and Baldwin gave him a written statement reading as follows:

"March 27– 1963
"Red Oak, Iowa

"On Sat March 23– 1963 – I came out to my farm and first noticed some fire over South & East from my buildings, over in the timber area. This was about 1:30 PM.

"I originally came to the farm to see if my lot was dry enough to shell corn.

"This 40 to 50 acres was seeded down in spring 1962—that burnt.

"I then walked out to the timber area and saw it was burning fairly slow and at that time did not believe the fire to cause any damage—because the river was on the east & to the north fairly the high Railroad Right of (was bare)MB (sic) some 30 ft. high.

"I had my car stuck and after getting it out the fire had burnt to the railroad and apparently was out.

"Before 3 PM I had walked down towards the bridge and from all appearance the fire was out.

"When I first came out to the fire I would estimate the wind at 20 to 25 MPH and blowing from the almost due south, at least the smoke later from the bridge was going straight north.

"After the railroad men were to see me I went out to try and find where the fire had started, after following south where it was burnt, the burnt area went south over into railroad land. There is an area of 2 to 3 acres on south of my land that was burnt.

"Fire apparently started south of my property.

"The railroad land south of my property is in the area of over 20 acres.

north MB
"About 10 acres located on the (south side) (sic) of the river where from all appearance the fire started.

"No way of knowing just how the fire could of started in the brush of mostly willow and undergrowth.

"My timber land being only about ½ mile from town it is quite common for people to hunt and fish without having any trouble.

"I have read the above statement from page #1 & page #2 and it is true as to the best of my knowledge.

"Milton Baldwin
"2116 Eastern Ave.
"Red Oak, Iowa"

Further investigation was assigned to Walter Heitzman, a lawyer and adjuster experienced in handling serious claims. Heitzman and the adjuster who took the first statement contacted Baldwin on April 1 or April 2, 1963. The adjusters and Baldwin went over the farm and burned area. While there Baldwin claimed that the fire started on land south of his farm. He reaffirmed his prior statement and indicated that he had a claim for fire losses in his seeded area. Heitzman accepted Baldwin's story and had a local realtor view the premises to appraise the damage and a photographer take pictures to preserve the record that the fire started south of the Baldwin land.

On March 25, 1963, Baldwin gave a written statement to a special agent of the railroad company. In it he said: "* * * On March 23, 1963, I had a fire on my land which burned a number of acres and also burned some Railroad Property. I had gone down to my farm at 1:30 P. M. on March 23, 1963, and at that time there was a fire burning on my land next to the River Bank and in a timber area. * * * I did not start any fire on my property and I do not know who did * * *."

Some time later two investigators for the railroad called on Baldwin. In a subsequent statement reported in question-and-answer form by a court reporter Baldwin gave this version of their conversation:

"Q. What was their purpose of seeing you? A. To talk to me about the origin of that fire.

"Q. Did they do this at your office? A. Yes.

"Q. Upon one occasion or more? A. I believe they were in twice in the period that they were here.

"Q. Did they take a signed statement? A. No.

"Q. What did you tell them as to the origin of the fire? A. I had not changed my story at that time about the origin of the fire.

"Q. What was their attitude as a result of their investigation? A. Special investigator said, I feel that we know the source of the fire; that our investigation points definitely to you and

that we would like to clean this thing up here and now. He further stated: this, he says, if you did set that fire and we can clear this thing up, I think I can get the Burlington Railroad to settle this case—not settle, but to agree. to not assess me over the $25,000 damages that I had liability insurance on.

"Q. How did this representative know your policy limits? A. I had shown them my policy. The first investigator was in there; I had shown our policy 'cause I had got it out and looked it over to see what I did have.

"Q. You had shown the policy to the original investigator from the CB&Q, and, at the same time, however, you were denying knowledge of the origin of the fire? A. That is right.

"Q. Now, the second representative who you mentioned to be from Burlington—to repeat you here—stated that he felt that the CB&Q would accept settlement or agree to a settlement of your policy limits upon what qualifications, Sir? A. He said if, and, repeating myself, if you did set that fire and we can conclude this case, that he thought that he could get the officials of the Burlington Railroad to agree to a settlement not over the policy limits.

"Q. Wasn't there any ifs or qualifications; wasn't there anything you were to do? A. I— I was— Only that if I did set the fire and was to make a statement of that fact, why, that is the way it would be. But that was not settled at that time; there was no admission at that time of anything.

"* * *

"Q. That's all right. To repeat: The idea was that if you started the fire and if you gave them a statement to that effect, they felt the CB&Q would accept your policy limits in settlement of their damages which were in excess of your policy limits? A. Right; right.

"Q. What did you reply to that suggestion? A. I told him that if I could be assured—let's see, I have got to study over this, just how I worded it 'cause I still was not admitting any liability. I told him that I wanted some other official of the Burlington Railroad to let it be known that that would be the case; to me.

"Q. Is that the way this conversation was left on that date? A. Yes. * * *"

Some time later Baldwin received a phone call from the local attorney for the railroad company requesting a conference. Baldwin's statement of their conversation was as follows:

"Q. What did he say when you got there, in substance? A. He said he had a letter from the Burlington Railroad stating, in essence, that if I was ready and I did start this fire, that they would give me a letter to the effect that the total limits of my liability for this fire would be within the policy limits of the $25,000.

"Q. At this point had you told anyone at all that you had started the fire? A. No.

"Q. What did you reply to their proposition? A. I said I was ready to admit the truth; that I had lived with it long enough and that I had to straighten it out.

"Q. It seemed like a pretty good proposition, didn't it? A. I felt they were more than fair as far as I was concerned. * * *"

At the trial Baldwin testified as follows:

"Mr. Swanson asked me whether I had in fact started the fire. He asked me to make a statement of the actual fact with reference to starting the fire and I made such statement which was reduced to writing in the form of an affidavit. The facts in said affidavit are true. * * *"

The affidavit was as follows:

"AFFIDAVIT

"STATE OF IOWA ⎱
⎰ ss.
"Montgomery County ⎰

"I, Milton Baldwin, of Red Oak, Montgomery County, Iowa, being first duly sworn, on oath depose and state as follows:

"1. That I am the owner of certain farm real estate located approximately one-half mile west of Red Oak, immediately South of and adjacent to the C. B. & Q. Railroad right-of-way, which land is on the West bank of the Nishnabotna River.

"2. That on March 23, 1963, at approximately 1:00 P.M. on said date, I started a fire on the south portion of my land above

described for the purpose of burning foxtail and other noxious weeds to prepare a small tract thereof for reseeding.

"3. That said fire got out-of-hand and spread across my land and onto the C. B. & Q. Railroad right-of-way and eventually spread to the river bridge owned by the railroad company, spanning the Nishnabotna River.

"4. That I have previously made statements, none of which have been under oath, in which I denied the fact that I had started any fire at the place and on the date above referred to. I now desire to alter said statements and tell the facts as they actually happened.

"I have read the foregoing statements and the facts therein contained are true and correct and if subpoenaed to do so, I would testify thereto in any court of record under oath.

"Dated this 25th day of April, 1963.

"–s– Milton Baldwin

"Subscribed and sworn to before me and in my presence by the said Milton Baldwin, this 25th day of April, 1963.

"(Seal)

"–s– Eva Meyer
"Notary Public in and for
"Montgomery County, Iowa."

On May 15, 1963, the railroad company admittedly in consideration of this affidavit and agreement executed a "Covenant and Agreement", and forwarded it to its local attorney. The local attorney contacted Baldwin, witnessed his signature thereto and delivered it to Baldwin. There is no claim that the local attorney had anything to do with the arrangements except to obtain the affidavit on April 25 and deliver the covenant on May 22. There is no evidence that anyone ever asked Baldwin to state anything but the truth. The "Covenant and Agreement" was as follows:

"COVENANT AND AGREEMENT

"WHEREAS, bridge #443.33 of the Chicago, Burlington & Quincy Railroad Company located at or near Red Oak, Iowa, was damaged and substantially destroyed by a fire on March 23,

1963, which fire the said C. B. & Q. claims was caused by the negligence of Milton Baldwin, a resident of Red Oak, Montgomery County, Iowa;

"For good and valuable consideration, receipt whereof is hereby acknowledged by it, the Chicago, Burlington & Quincy Railroad Company (hereinafter called C. B. & Q.) hereby covenants and agrees with the said Milton Baldwin that in the event said C. B. & Q. shall hereafter recover judgment against said Baldwin for any amount in excess of $25,000 in any action brought in connection with the foregoing loss by the C. B. & Q., it will not levy execution under said judgment or in any other manner attempt to collect said judgment in any amount in excess of $25,000.

"It is hereby expressly understood and agreed by C. B. & Q. and Baldwin that this instrument is not a release of the said Baldwin, his heirs, personal representatives, successors or assigns, nor of any person, firm or corporation which is or may hereafter be liable to said C. B. & Q. because of said damage to its bridge or because of any judgment which the C. B. & Q. may hereafter obtain; but this instrument is intended by both parties hereto as simply a covenant by the said C. B. & Q. not to collect from the said Baldwin, his heirs, personal representatives, successors or assigns, any excess over $25,000 of any judgment which the said C. B. & Q. may hereafter obtain against the said Baldwin.

"The said Baldwin does not by the acceptance of this Covenant and Agreement thereby admit that he was negligent as claimed by the C. B. & Q.

"It is Expressly Understood and Agreed By Both Parties Hereto That This Is Not A Release and That No Payment of Damages by Baldwin to C. B. & Q. Has Been Made.

"Dated this 15 day of May, 1963.

"Chicago, Burlington & Quincy
"Railroad Company
"By C. W. Krohl
" C. W. Krohl
" General Solicitor

"The foregoing Covenant and Agreement executed in duplicate, read, approved and accepted this *22nd* day of *May*, 1963.

"Milton Baldwin
_____
"Milton Baldwin

"Witness:
"R. John Swanson"

In its answer to plaintiff's petition in the case before us the railroad company admitted "that this defendant agreed with defendant Baldwin that if he would tell the truth admitting that he set the fire as he did in executing Exhibit 'C' to the Petition, this defendant would execute a written instrument agreeing not to attempt to collect any sum in excess of $25,000 on any judgment which it might obtain against defendant Baldwin as the result of the fire, all in accordance with the terms of Exhibit 'D' to the Petition, and at the time thereof this defendant was informed and believed that said $25,000 was the limit of defendant Baldwin's insurance protection under the policy issued by plaintiff, Exhibit 'A' to the Petition."

Not until August 5, when questioned by plaintiff's representatives, did Baldwin disclose to plaintiff what he had done or let plaintiff know of the existence of the covenant.

On October 2, 1963, the railroad company filed suit against Baldwin for $53,790 damages in the United States District Court. The record before us does not disclose what has happened in that case.

In the case before us the trial court held that plaintiff did not prove that it suffered prejudice by reason of the acts of defendant Baldwin and that the acts of Baldwin did not breach the cooperation clause of his insurance contract.

Plaintiff has appealed.

I. It appears by his own admissions that Baldwin lied repeatedly to escape responsibility for his own acts. Only when it appeared that he could save money by telling the truth did he retract. It may be that, as he said, his conscience prompted him but the prompting appears to have been coincident with an offer of relief from excess liability of $28,790 over his insurance coverage.

Webster's Third New International Dictionary includes among the definitions of a bribe "something that serves to induce or influence to a given line of conduct." Bribery is defined as "the act of influencing the action of another by a bribe." Even though Baldwin may have told the truth after receiving the railroad's offer the conclusion is inevitable that the offer of relief from liability was persuasive and effective. Webster's definitions apply. We are now asked to view such falsehoods and actions as inconsequential and without prejudice. That we cannot do.

II. Condition 5 of the insurance policy, quoted supra, requires the assured's cooperation with the insurer.

Was there a breach of the policy provision requiring cooperation? We think there was a clear, intentional and serious breach. The kind of cooperation required by the policy is honest cooperation. Honest cooperation involves telling the truth. It cannot be based on persistent falsehood going to the very essence of the problem. What we have here is not a mere technical failure to comply with the strict provisions of the policy. It is not a case of slight or temporary deviation from the truth.

On June 18 Baldwin told plaintiff's adjuster that he had changed his story but from March 27 until then Baldwin persisted in an apparently convincing, but utterly false, story to plaintiff as to the cause and source of the fire. He indicated that he had a claim for damage to his own fields. He acquiesced in plaintiff obtaining an appraisal of his own damages. He acquiesced in plaintiff preserving evidence of what plaintiff thought was the truth but defendant knew was false. He attempted to suborn and suppress evidence. Regardless of what the covenant he received from the railroad company may be called he made a secret deal with the railroad company for relief from a possible $28,790 liability. He caused extra and unnecessary expense and caused plaintiff to unknowingly adopt an untenable position. On July 25 counsel for the railroad company and plaintiff discussed settlement but plaintiff did not know about the covenant. By branding himself as unworthy of belief he effectively destroyed himself as an aid to plaintiff in negotiating a settlement or in defending a lawsuit.

III. Condition 8 of the insurance policy, quoted supra,

makes full compliance with the terms of the policy a condition precedent to action against the company. It was the duty of the insured to show compliance with the terms of the policy.

 The law in Iowa is well settled. Where there is a breach of a condition precedent in an insurance policy prejudice to the insurer is presumed. The presumption is rebuttable but the burden to show lack of prejudice by satisfactory evidence is on the insured. Henderson v. Hawkeye-Security Insurance Co., 252 Iowa 97, 106, 107, 106 N.W.2d 86.

The cited case involved the failure of the insured to give timely notice of an accident to his insurance carrier and it is now argued that different rules should apply to the case at bar. We do not agree. In the case before us the policy provisions as to conditions precedent are as strong or stronger than in Henderson. The language in Henderson is clear and positive. We said (pages 105, 106):

"Even with the liberal construction usually given insurance contracts, we cannot justify the position that, unless the company proves prejudice, there can be no breach of the contract which would relieve the company of liability. Such a construction would truly rewrite the contract and be most unreasonable. Thus while the insured may avoid a breach of contract in many instances by showing excuse or legal justification, once the unexcused breach has been found and not waived, prejudice should be presumed. Such is the case before us.

 "It is fundamental contract law that plaintiff has the obligation to prove compliance with the terms of such a contract or to bring himself under recognized exceptions. Only when plaintiffs have satisfactorily shown excuse or legal justification, such as reasonable mistake or trivial occurrence, does the burden to show actual prejudice fall upon the defendant-insurer, and then it becomes an element in the question of substantial compliance."

This language is as applicable to the facts before us as it was to the failure to give timely notice of an accident.

In Henderson the authorities are extensively analyzed and cited. Repetition here is unnecessary. We adhere to the general principles of the Henderson opinion.

In the case at bar the trial court cited Glade v. General Mutual Insurance Association, 216 Iowa 622, 246 N.W. 794, as one of the closest Iowa cases. Defendants here lean heavily thereon. The trial court said:

"In the Glade case the cooperation clause was substantially the same as in the case at bar. The facts in that case, the Court held, failed to show a breach of the provisions of the policy, although the assured testified he was at fault in the accident and that he may have on some occasions admitted personal liability. The case also held that no prejudice resulted to the insurance company. That regardless of the insured's conduct, the insurance company is liable unless it proves prejudice. What really constitutes 'prejudice' is a question on which reasonable minds may logically differ. In many jurisdictions, and possibly a majority, hold that prejudice need not be proved to avoid liability of the insurance company."

We do not read the cooperation clause in the Glade case to be as broad as in the case at bar. Neither do we find any mention in the Glade case of compliance by the insured as a condition precedent to recovery by the insured.

In Glade the court found that the facts failed to show a breach of the policy provisions or prejudice. To the extent that Glade holds that regardless of the insured's conduct the insurance company is liable unless it proves prejudice it is clearly, even though not specifically, overruled by Henderson. The Henderson case adopts the view expressed in the dissenting opinion in the Glade case. It is our most recent applicable pronouncement and is the law of Iowa.

IV. Defendants argue that the "Covenant and Agreement" quoted supra is neither a release nor a covenant not to sue. Except as an example of legalistic semantic prestidigitation it would be hard to give it a name. We need not give it a name or determine its full legal effect. It is clear, however, that regardless of what the document is called it was intended as a waiver of any right to collect more than $25,000, which was the maximum amount for which Baldwin was insured and that Baldwin thought he would be relieved from financial loss. The testimony indicates what Baldwin thought he was getting. The cove-

nant itself acknowledges a good and valuable consideration. The railroad company was getting valuable help and the foundation for a good lawsuit presumably at plaintiff's expense.

On May 22 Baldwin received and accepted the written covenant executed pursuant to the previous agreement but made no disclosure to plaintiff until questioned on August 5. Secrecy for that long is not in accord with good faith.

V. We need not determine how or to what extent the plaintiff could have successfully defended against the railroad company's claim if Baldwin had initially told the truth. Proof that Baldwin set the fire or negligently permitted it to escape would, of course, lay the foundation for recovery but other matters might be involved. Early cases such as Conn v. May, 36 Iowa 241, and Thoburn v. Campbell, 80 Iowa 338, 45 N.W. 769, hold that a person setting fire to prairie or timberland and allowing it to escape is absolutely liable for the consequences.

Ellsworth v. Ellingson, 96 Iowa 154, 64 N.W. 774, however, indicates that there may be circumstances under which there is no liability unless negligence is shown.

The lawsuit in United States District Court by the railroad company against Baldwin, mentioned supra, alleged that Baldwin unlawfully and negligently set the fire and permitted it to spread to the railroad in violation of sections 707.7 and 707.8, Code of Iowa, 1962. These sections are the same in substance as were involved in the early cases.

Section 707.7 is as follows:

"Setting out fire. If any person willfully, or without using proper caution, set fire to and burn, or cause to be burned, any prairie or timbered land, or any inclosed or cultivated field, or any road, by which the property of another is injured or destroyed, he shall be fined not exceeding five hundred dollars, or imprisoned in the county jail not more than one year, or be both so fined and imprisoned in the discretion of the court."

Section 707.8 is as follows:

"Allowing fire to escape. If any person, between the first day of September in any year and the first day of May following, set fire to, burn, or cause to be burned, any prairie or timbered land, and allow such fire to escape from his control, he shall be

imprisoned in the county jail not more than thirty days, or be fined not exceeding one hundred dollars."

It may be that the railroad company would have prevailed in any event but the issue is not directly before us and we cannot hold as a matter of law that there would have been no defense in the first instance. Any defense, however, was compounded by the embarrassment of having to depend on a client who had successfully impeached himself.

VI. We have noted in Division III, supra, that prejudice is presumed and that the burden is on the insured to rebut the presumption. As said in Henderson v. Hawkeye-Security Insurance Co., supra, the insured had the duty to prove compliance with his contract. That he did not do. When he failed to do so he was outside the protection of his policy. See Condition 8 quoted supra. He had not complied with the conditions precedent. To bring himself back within the protection of the policy the burden was on the insured to show lack of prejudice. While the prejudice presumed or shown must be more than nominal or inconsequential the existence of prejudice does not depend on the amount.

Defendants argue that plaintiff was liable under its insurance policy to the extent of $25,000 and that compared therewith the prejudice to plaintiff was small. That is not the point. It assumes a maximum and absolute liability in any event. It denies plaintiff a right to defend against the railroad company. It attempts to weigh the dollars involved. It puts a premium on first telling an untruth and retracting only when a saving of $28,790 was offered. It overlooks the fact that in dealing with the railroad company plaintiff was in an untenable position by not knowing of the agreement between Baldwin and the railroad company. It ignores a basic maxim in equity that to prevail a litigant should have clean hands.

In the case at bar prejudice is presumed. It also appears affirmatively that there was a waste of time, effort and expense. The extent to which plaintiff was prejudiced by ending up with an insured whose credibility was self-destroyed cannot be determined. Neither can it be brushed aside as inconsequential.

Defendants failed to overcome the presumption of prejudice.

476

The case is reversed and remanded to the district court for the entry of judgment and decree holding that the provisions of plaintiff's insurance policy #FCP2-226-890 were violated to the prejudice of the insurer and that plaintiff Western Mutual Insurance Company is relieved from liability thereon.—Reversed and remanded.

All JUSTICES concur.