**IN THE COURT OF APPEALS OF TENNESSEE**
**AT NASHVILLE**

STATE AUTO INSURANCE )
COMPANY, )
)
    Plaintiff/Appellee, )      Appeal No.
)      M1998-00900-COA-R3-CV
v. )
)      Lawrence County Chancery
RAYMOND L. BISHOP, )      No. 8250-96
)
    Defendant/Appellant. )
)

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CHANCERY COURT
FOR LAWRENCE COUNTY

THE HONORABLE JIM T. HAMILTON

MICHAEL P. MILLS
MILLS & COOPER
NASHVILLE, TENNESSEE

ATTORNEY FOR PLAINTIFF/APPELLEE

TOM W. MOORE, JR.
MOORE & PEDEN, P.C.
COLUMBIA, TENNESSEE

ATTORNEY FOR DEFENDANT/APPELLANT

**AFFIRMED AND REMANDED**

                    PATRICIA J. COTTRELL, JUDGE

CONCUR:

CANTRELL, P. J.
KOCH, J.

# OPINION

State Auto Insurance Company ("State Auto") commenced this declaratory judgment action against its insured, Raymond Bishop, to determine whether Mr. Bishop failed to comply with conditions precedent to his recovery under a homeowners policy. Mr. Bishop counterclaimed, seeking unpaid proceeds from the policy and bad faith penalties. After the trial court found for State Auto, Mr. Bishop commenced this appeal. For the following reasons, we affirm.

On May 18, 1995, a tornado which State Auto classified as catastrophic hit Lawrence County, Tennessee, damaging Mr. Bishop's dwelling, outbuildings, and personal property. After Mr. Bishop notified State Auto of the damage on or about May 19, a claims representative, Jeff Lewis, was assigned to handle the claim. Mr. Lewis maintained that he initially contacted the Bishops on May 19. Due to the number of claims arising from the storm, Mr. Lewis was unable to retain a contractor who could make immediate repairs. He arranged for Tarpley Construction Company ("Tarpley Construction") to begin repairs to Mr. Bishop's property in late May or early June. Tarpley Construction commenced repairs on or about May 26.

During a May 25 telephone conversation with Mary Bishop, Mr. Bishop's wife, Mr. Lewis asked her to compile a price list of the damaged property. The next day, according to Mr. Lewis, Mr. Bishop called, "yelling and cussing" that no one had contacted him. Mr. Bishop purportedly ordered Mr. Lewis to "come down with his checkbook."

On July 7, State Auto sent agent Jo Oldenski to inspect the premises and the progress of the repairs. She reported that several outbuildings had not yet been repaired, but the roof and windows of the house were almost complete. Interior repairs to the drywall, paneling, and floor were finished. She reported that Mr. Bishop was dissatisfied with the roof repairs because the shingles did not extend to the edge of the roof. She also noted that the paneling color and floor pattern did not match the originals.

On August 2, 1995, State Auto issued a $15,178.33 check to Mr. Bishop. As part of the documentation for this payment, Tarpley Construction submitted a list of contents damaged by the storm. The list was of items Tarpley Construction arranged to be cleaned or repaired. The check covered these expenses as well as the construction work.

State Auto subsequently sought this check's return, claiming it should have been issued to Tarpley Construction for the repairs it made to the Bishops' property rather than to Mr. Bishop alone. Both Mr. Lewis and his supervisor, Larry Winters, arranged to visit and inspect the Bishop property on August 31 while retrieving the check. At some unspecified later date, State Auto paid Tarpley Construction directly for repairing Mr. Bishop's home. On July 20, 1995, Mr. Bishop signed a Completion Certificate which stated that the work by Tarpley Construction was satisfactorily completed.

It was learned at trial that on August 12, 1995, Mr. Bishop held an auction of his personal property, including a couch, table, chairs, shop and welding equipment, a lathe, sheet metal tools, automobiles and car parts, bushhogs, and other equipment. He purportedly earned approximately $17,000 from the sale. It is undisputed that Mr. Bishop did not notify State Auto of this sale. At trial, Mr. Bishop admitted that he disposed of a lot of personal property

3

at this sale, but provided only a few receipts.

On August 31, before leaving for the previously arranged trip to the Bishops' house, Mr. Winters called to assure that the visit was convenient, to inform Mr. Bishop that he intended inspect anything Mr. Bishop desired, and to conclude the claim in its entirety. When Mr. Lewis and Mr. Winters arrived to retrieve the mistakenly issued check, Mr. Bishop refused to shake hands, to allow them to inspect the damage, to let them inside his home, to discuss the claim, or to return the check. When Mr. Winters asked for the list of damaged items, Mr. Bishop responded that it was not complete. The insurance men claimed Mr. Bishop cursed them, claimed to have cashed the check, and told them to leave.[1] As they were leaving, they noticed a sign on the property which said "Ray's Machine Shop" or "Ray's Tool and Die." This raised a question about coverage because Mr. Bishop's policy did not cover outbuildings used in business.

Shortly thereafter, the Bishops sent State Auto a list of the property they lost in the tornado. On September 13, Mr. Winters responded by advising the Bishops that until they returned the $15,178.33 check, their claim would not be resolved. The letter also stated that upon receipt of the mistakenly issued check, they would be sent a $5,640 payment to cover damage to appurtenant structures. Mr. Winters's letter also informed the Bishops that:

> The list of contents items you have submitted, will be in need of supporting documentation. For your convenience, we enclose an inventory form which will allow you to present additional information such as the date on which an item was purchased, the identity of the brand, make or model of the item involved, the original cost, and other information as is indicated on the form. It will also be necessary that you make each of these items available for inspection in order that we can determine the type and/or extent of damage sustained. It will also be required that you cooperate with us to provide information as to where these items were located

---

[1]Mr. Bishop later testified that he had lied about cashing the check.

when they were damaged as well as to identify the usage of these items as we request. We would also have questions regarding invoices from Ray's Machine and Tool Company. We would also have questions about charges you have shown for lodging. Especially we would question a charge on 5-2-95, when this loss occurred on 5-18-95. . . .

In separate correspondence that same day, State Auto notified the Bishops that it was canceling their insurance. State Auto issued a refund of $110. Mr. Lewis had recommended the cancellation of the Bishops' policy in an underwriting report in May, shortly after his first contact with Mr. Bishop. Mr. Lewis testified that "there were times that I would talk to him in the morning. I would talk to him again that afternoon and he would say he hadn't talked to anybody since the date of the loss." Both Mr. Lewis and the contractor alleged that Mr. Bishop cursed them during almost every contact.

On September 20, 1995, Mr. Bishop responded to Mr. Winters's inquiry about the claim made for lodging charge on May 2, 1995. He stated that he written the wrong date on his claim and had incurred the motel bills in June, after the tornado.

On November 3, 1995, State Auto received the completed inventory form previously sent to the Bishops on September 13, which again listed their lost and damaged property. This second list included more items than the first list. In this second list, Mr. Bishop raised his estimate of the cost of some of the lost items included on the first list. For example, on the first list he valued a satellite system at $1,500. He increased his valuation to $2,500 on the second list and stated that the original cost was $3,500, although it was later learned that the system had been given to him. An entertainment center valued on the first list at $700 was estimated at $800 on the second. An air conditioner valued at $450 on the first list was listed as $650 on the second. In all, he increased the value of 25

5

items included on the second list.   Virtually none of the items were reduced.

After hearing nothing from Mr. Bishop for several months, State Auto closed his file in February 1996.  On March 6, 1996, Mr. Bishop sent State Auto the voided check for $15,178.33 which mistakenly had been issued to him.  He testified that he held onto the check until it expired just to make his insurer wonder.  State Auto never paid any remaining proceeds under the policy.  Mr. Bishop subsequently retained counsel, who demanded payment on November 12, 1996.

State Auto filed the underlying declaratory judgment action on December 18, 1996, alleging that Mr. Bishop failed cooperate with the terms and conditions of the policy.  Specifically, State Auto asserted that Mr. Bishop refused to meet with its agents to resolve the claim, failed to provide an inventory of items until November 3, 1995, and thereafter made no contact for over one (1) year.  The complaint sought a declaration that Mr. Bishop was not entitled to receive any proceeds under the policy.

Mr. Bishop answered and counterclaimed, alleging fraud based upon State Auto's assertion that after the $15,178.33 check was returned, his claim would be processed.  Mr. Bishop also alleged bad faith failure to pay.

At trial, Mr. Bishop admitted that he had submitted receipts from his business, Ray's Machine and Tool, to State Auto for "outside electrical work." The receipts, which totaled over $200, were for power poles and a security light, which he had on hand, and for labor, although he admitted that he incurred no labor costs.  Mr. Bishop had not paid the amounts on the receipts.  He also admitted that he sought his policy limits for additional living expenses without establishing that he actually spent that amount and that he listed $3,000 in debris removal, despite the fact that he only paid $100.  He admitted that when he sent

6

the list of allegedly damaged personal property to State Auto in November 1995, most of the property included on it was gone, having been sold by him in August. When he told Mr. Winters and Mr. Lewis on their August 31 visit that he had not finished the list of damaged personal property because he was "still searching through stuff," he was aware "most of" the property was gone, having been sold.

The trial court found that Mr. Bishop was not entitled to any proceeds under his homeowners policy because he did not cooperate with State Auto as required by the policy and failed to comply with the terms and conditions of the policy. In support of these conclusions, the trial court specifically found that: Mr. Bishop never fully cooperated with State Auto's agents when they attempted to settle his claim; he refused to return the $15,178.33 check mistakenly sent him and held it for 180 days; he held an auction where he sold his personal property, which produced $17,000, and never notified State Auto of the sale; and when State Auto sent agents to settle the claim, Mr. Bishop prohibited them from inspecting the alleged damaged property and the personal property which he had already sold. The court found that Mr. Bishop cursed the agents, called them obscene names, and told them to leave.

I.

This case was tried before the court without a jury. Our standard of review, therefore, is *de novo* upon the record, with a presumption of correctness of the findings of fact by the trial court. *See Squibb v. Smith*, 948 S.W.2d 752, 754 (Tenn. Ct. App. 1997). Unless the evidence otherwise preponderates against those findings, we must affirm, absent an error of law. *See* Tenn. R. App. P. 13(d).

On appeal, Mr. Bishop argues that the trial court erred in finding that his actions constituted a breach of the non-cooperation provisions of his policy. He also claims that State Auto failed to establish that his non-cooperation was sufficiently substantial and material to warrant nonpayment of his claim.

The purpose of including a cooperation clause in a policy and for conducting examinations pursuant to it is obvious enough. *See Shelter Ins. Co. v. Spence*, 656 S.W.2d 36, 38 (Tenn. Ct. App. 1983). The insurer is:

> entitled to obtain, promptly and while the information is still fresh, "all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights to enable them to decide upon their obligations, and to protect them against false claims."

*Id.* (quoting *Dyno-Bite, Inc. v. The Travelers Co.*, 80 A.D.2d 471, 439 N.Y.S.2d 558, 560 (1981)).

Tennessee courts have consistently upheld clauses requiring insureds to cooperate with their insurance companies. *See Linehan v. Allstate Ins. Co.*, No. 01A01-9308-CH-00387, 1994 WL 164113 at * 4 (Tenn. Ct. App. May 4, 1994) (no Tenn. R. App. P. 11 application filed) (citing 8 John A. Appleman & Jean Appleman, Insurance Law & Practice § 4771 (1981)). Our courts view these clauses as conditions precedent and consider their viability "so often sustained that the question should be considered at rest." *Horton v. Employers' Liab. Assur.*

*Corp.*, 179 Tenn. 220, 224, 164 S.W.2d 1016, 1017 (1942); *see Hartford Accident & Indem. Co. v. Partridge,* 183 Tenn. 310, 314-15, 192 S.W.2d 701, 702-03 (1946).

The clause at issue states in pertinent part:

**Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done: . . .

d. (3) keep an accurate record of repair expenses;

e. prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory.

f. as often as we reasonably require:

(1) show the damaged property;

(2) provide us with records and documents we request and permit us to make copies; . . .

The record showed that Mr. Bishop did not turn in an inventory of damaged personal property for over three months after the damage occurred. During that time, he sold much of his personal property and offered little or no documentation of its value. Mr. Bishop failed to disclose that he held an auction to dispose of the goods. He refused to allow State Auto's agents to inspect his real property or the allegedly damaged personal property. The inflated values included on the second inventory list Mr. Bishop submitted to State Auto and the dearth of documentation raise serious questions about the reliability of the list. Mr. Bishop provided receipts from Ray's Machine and Tool that he never paid. Mr. Bishop admitted that he never spent the $3,000 in debris removal or the $900 in additional living expenses that he claimed.

Manifestly, the obtaining of true and accurate information about the type and extent of damage to the insured premises

and its contents is relevant and material.

*Shelter Ins. Co.*, 656 S.W.2d at 38. Mr. Bishop's actions prevented the insurer from obtaining verifiable information about the nature and extent of the damage. Accordingly, we find that his actions breached the cooperation clause in the policy.

As stated above, Mr. Bishop asserts that State Auto failed to establish that any non-cooperation on his part was sufficiently substantial and material to warrant a finding that he breached the insurance contract. This requirement of a showing of substantial prejudice due to the insured's non-cooperation as a prerequisite to using that non-cooperation as a defense to liability finds its basis in several opinions of this court, the first being *Thaxton v. Allstate Ins. Co.*, No. 87-251-II, 1988 WL 23922 (Tenn. Ct. App. March 18, 1988) (Tenn. R. App. P. 11 application denied July 18, 1988). *See also Allstate Ins. Co. v. Auto Owners Ins. Co.*, No. 03A01-9706-CH-00225, 1998 WL 102075 (Tenn. Ct. App. Feb. 27, 1998) (Tenn. R. App. P. 11 application denied Oct. 19, 1998) .

In *Thaxton*, this court explained that:

> the insured's lack of cooperation must be substantial and material to result in a breach of a policy condition. Courts have developed, in effect, three different doctrines in this area. The largest number of courts have adopted the standard of substantial prejudice to the insurer. If the insured violates the cooperation clause, the insurer may use this breach as a defense only where it can show that it was substantially prejudiced by the breach. 8 J. Appleman, Insurance Law and Practice, § 4773 (1981); R. Anderson and M. Rhodes, 14 Couch on Insurance, § 51:118 (1982). *See Foundation Reserve Ins. Co. v. Esquibel*, 94 N.M. 132, 607 P.2d 1150, 1152 (1980) and cases cited therein. A few states have adopted the "California rule," which presumes prejudice when the cooperation clause is breached. *Valladao v. Fireman's Fund Indem. Co.*, 13 Cal.2d 322, 89 P.2d 643, 649 (1939); *Western Mut. Ins. Co. v. Baldwin*, 258 Iowa 460, 137 N.W.2d 918, 925 (1965); *Bass v. Aetna Cas. & Sur. Co.*, 199 So.2d 790, 793 (Fla.App.1967).

Appleman describes this as "probably the better rule, since the insurer does not have the onus of proving that the injured person could not possibly have recovered had cooperation been rendered; yet in those cases where lack of cooperation was not of decisive importance the insured could rebut the presumption." 8 J. Appleman, *supra*, § 4773.

Still a third approach is to reject the whole notion of substantial prejudice, and to adopt a rule that a breach of the cooperation clause under any circumstances is prejudicial; proof of actual harm is immaterial, unless the breach is "trivial" or "innocent." *Glens Falls Indem. Co. v. Keliher*, 88 N.H. 253, 187 A. 473, 477 (1936); *Pearl Assurance Co. v. Watts,* 58 N.J.Super 483, 156 A.2d 725, 730 (1959). Some courts in states which, like Tennessee, consider cooperation by the insured a condition precedent to any action against the insurer when a cooperation clause is included in the policy, *Horton v. Employers Liab. Assur. Corp., supra,* 179 Tenn. at 224, 164 S.W.2d at 1017, have adopted this view, holding that the terms of the policy must be fully complied with unless the insured can show justification for the failure to cooperate. *Wolverine Ins. Co. v. Sorrough,* 122 Ga.App. 556, 177 S.E.2d 819, 822 (1970); *U.S. Fire Ins. Co. v. Watts,* 370 F.2d 405, 410 (5th Cir.1966) (construing Alabama law).

We believe that this position is unrealistic on two counts: 1) Courts following it are almost always forced into making exceptions for "trivial" or "innocent" breaches, as in the *Wolverine* case, which is hardly different from recognizing the "substantial prejudice" standard; and, 2) as Appleman points out, "liability contracts are, at least in part, third party beneficiary contracts and ... it is in the public interest to see that [injured persons] who are themselves free from fault should recover--with policy defenses being looked upon with disfavor except where a miscarriage of justice would result." 8 J. Appleman, *supra*, § 4773.

We think that, as a practical matter, placing the burden on the insurer to show substantial prejudice is the best rule to adopt. If the noncooperation of the insured is meaningful, such should be readily apparent from the circumstances of the case. If it was merely peripheral, then this too should be apparent from the insurance company's proof. Under the "California rule" advocated by Mr. Appleman, the burden would be on the insured to show that his non-cooperation, once proved, was not meaningful. Although this is certainly a workable system, we believe

that instead of putting the burden on the insured to prove a negative, the burden should more properly be put on the insurer to prove a positive; viz., that the noncooperation was substantial and material, and in some meaningful way hindered the insurer's investigation or defense. This is not a high evidentiary threshold. We agree with Mr. Appleman that "if the rule is carried to the point of imposing an almost insurmountable burden of proving that the verdict was the result of the lack of cooperation, it would amount to a perversion of such contractual provision." 8 J. Appleman, *supra,* § 4773. **It is simply necessary for the insurer to show that the noncooperation would more likely than not seriously interfere with the insurer's investigation of the claim or defense of the action.**

*Thaxton v. Allstate Ins. Co.*, 1988 WL 23922 at * 2 (emphasis added.)

In a recent opinion, the United States District Court for the Western District of Tennessee determined that, although it thought that *Thaxton* provided the better rule, it was bound to follow Supreme Court precedent on this topic, specifically, *Horton v. Employers Liab. Assur. Co.*, 179 Tenn. at 220, 164 S.W.2d at 1016, and its progeny. *See Allstate Indem. Co. v. Fifer*, 47 F. Supp.2d 913, 916 (W.D. Tenn. 1998). According to the federal court, this line of cases held that no showing of prejudice was required under Tennessee law to enforce a non-cooperation clause. *See id.*, 47 F. Supp.2d at 916-17.

Our Supreme Court has not spoken directly to the prejudice requirement established in *Thaxton*, and we are not convinced that the Court would not require a showing a prejudice. The *Horton* court did not specifically broach the subject of prejudice. Further, most of the cases relied upon by the federal court clearly involved prejudice to the insurer and none precluded a finding of prejudice. *See Horton*, 179 Tenn. at 220, 164 S.W.2d at 1016; *Pennsylvania Ins. Co. v. Horner*, 198 Tenn. 445, 281 S.W.2d 44

12

(1955) (failure to provide proper notice to insurer); *Goodner v. Occidental Fire & Cas. Co.*, 59 Tenn. App. 317, 440 S.W.2d 614 (1968) (failure of insured to appear at trial).

In any event, assuming that State Auto was required to demonstrate prejudice, the position most favorable to Mr. Bishop, the insurer has successfully shown that Mr. Bishop's non-cooperation "more likely than not seriously interfere[d] with . . . [its] investigation of the claim or defense of the action." *Thaxton*, 1988 WL 23922 at *2. Mr. Bishop characterized his non-cooperation as merely cursing and rudeness. However, as the trial court found, Mr. Bishop also made it impossible for the insurer to view the damaged property and sold off personal property he later claimed was damaged.

Moreover, in addition to the cooperation requirement, Mr. Bishop's policy included other terms and conditions which must be complied with for coverage. It had a separate condition which voided the policy if an insured:

a. intentionally concealed or misrepresented any material fact or circumstance; or

b. made any false statements or engaged in fraudulent conduct; . . .

The record shows that Mr. Bishop submitted claims which he later admitted had no factual basis. These acts could independently preclude recovery under the policy, although the trial court made no specific findings on whether Mr. Bishop committed fraud. In any event, the submission of inaccurate and false claims on the scale present in this case are evidence of non-cooperation, and such claims prejudice the insurer in determining its obligations.

13

II.

Mr. Bishop argues that even if he breached the cooperation clause, State Auto is liable under the policy because it failed to expressly reserve its rights and waived the breach by continuing to process his claim. Mr. Bishop asserts that State Auto should be estopped from denying coverage by its failure to inform him that his claim was being denied.

The need for a reservation of rights arises after an insured is sued by a third party and seeks a defense to the underlying action. The law in this state prohibits an insurer from denying coverage under a cooperation clause "after it has conducted a defense for its insured, without first reserving its rights through some form of notice." *Allstate Ins. Co. v. Auto Owners Ins. Co.*, 1998 WL 102075 at * 3.

> The general rule supported by the great weight of authority is that if a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage. In other words, the insurer's unconditional defense of an action brought against its insured, constitutes a waiver of the terms of the policy and an estoppel of the insured [sic] to assert such grounds.

*American Home Assur. Co. v. Ozburn-Hessey Storage Co.*, 817 S.W.2d 672, 675 (Tenn.1991) (quoting *Maryland Cas. Co. v. Gordon,* 371 S.W.2d 460, 464 (Tenn. App.1963), in turn quoting 29A Am. Jur., *Insurance* § 1465, p. 577).

Here, it is undisputed that State Auto did not conduct a defense on behalf of Mr. Bishop. Mr. Bishop was not sued by a third party and he never sought representation by State Auto. Thus, no reservation of rights was

14

required to prevent a waiver of the terms of the policy requiring cooperation. *See id.*

Further, the record refutes Mr. Bishop's contention that State Auto waived the breach by continuing to process his claim. While an insurance carrier may waive any contractual provision of an insurance policy by the acts, representations, or knowledge of its agents, "there must be a clear, unequivocal, and decisive act of the party showing such a purpose, or acts amounting to an estoppel on [its] part." *Kentucky Nat'l Ins. Co. v. Gardner*, No. 01A01-9808-CV-00445, 1999 WL 378334 at * 5 (Tenn. Ct. App. June 11, 1999) (Tenn. R. App. P. 11 application denied Oct. 18, 1999); *see Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 13 (Tenn.1991). A waiver is an intentional relinquishment of a known right. *See Baird v. Fidelity-Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384, 389 (Tenn.1942). In this state it is universally accepted that:

> "Abandonment or waiver of a right important to parties cannot be made out by uncertain implication, but ought clearly to appear. To constitute such a waiver of a benefit there must be clear, unequivocal, and decisive acts of the party, an act which shows a determination not to have the benefit intended." *Charleston, S.C., Mining & Mfg. Co. v. American Agric. Chem. Co.*, 126 Tenn. 18, 150 S.W. 1143, 1146 (Tenn.1911); *accord Springfield Tobacco Redryers Corp. v. City of Springfield*, 41 Tenn. App. 254, 293 S.W.2d 189, 198 (Tenn. App.1956); *Koontz v. Fleming*, 17 Tenn. App. 1, 65 S.W.2d 821, 825 (Tenn. App.1933); *see also Stovall of Chattanooga, Inc. v. Cunningham*, 890 S.W.2d 442, 444 (Tenn. App.1994); *Trice v. Hewgley,* 53 Tenn.App. 259, 381 S.W.2d 589, 595 (Tenn. App.1964); *Webb v. Board of Trustees of Webb School,* 38 Tenn. App. 173, 271 S.W.2d 6, 19 (Tenn. App.1954). The law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence. *Koontz,* 65 S.W.2d at 825; *see also Springfield Tobacco Redryers*, 293 S.W.2d at 198. Waiver may be proved by "express declaration; or by acts and declarations manifesting an intent and purpose not to claim the

> supposed advantage; or by a course of acts and conduct, or
> by so neglecting and failing to act, as to induce a belief
> that it was [the party's] intention and purpose to waive."
> *Baird v. Fidelity- Phenix Fire Ins. Co.*, 178 Tenn. 653, 162
> S.W.2d 384, 389 (Tenn.1942) (quoting *Farlow v. Ellis*, 81
> Mass. 229, 231 (1860)). In order to establish waiver by
> conduct, the proof must show some "absolute action or
> inaction inconsistent with the claim or right" waived.
> *Koontz*, 65 S.W.2d at 825; *accord Stovall*, 890 S.W.2d at
> 444; *Webb*, 271 S.W.2d at 19. Specifically, the record must
> show conduct on the part of the insurance carrier which is
> so clearly inconsistent with an intention to insist upon a
> strict compliance with the provision at issue that the
> conduct constitutes an implied waiver. *Crumley v.
> Travelers Indem. Co.*, 225 Tenn. 667, 475 S.W.2d 654,
> 658 (Tenn.1972).

*Kentucky Nat'l Ins. Co.*, 1999 WL 378334 at * 5.

We find no evidence revealing actions by State Auto which satisfy this criteria. Instead, the record affirmatively establishes that there was no waiver. Mr. Winters's September 13, 1996 correspondence to Mr. Bishop delineated the numerous issues that required resolution before the claim could be processed. These included return of the mistakenly issued check, clarification of certain items listed as losses, and allowing inspection of the items. Because Mr. Bishop never fully complied with the instructions in Mr. Winters's letter, State Auto did not continue to process the claim. The fact that Mr. Bishop admittedly sold many of the items he claimed as losses at his auction precluded him from fully complying even had he departed from his previous practice and allowed State Auto's agents to inspect his property. A preponderance of the evidence supports the trial court's implicit conclusion that no waiver occurred.

Nor do we find that State Auto is estopped from asserting a breach of the cooperation clause.

The essential elements of an equitable estoppel as related

16

> to the party claiming the estoppel, are, (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially. *Provident Washington Ins. Co. v. Reese*, 213 Tenn. 355, 373 S.W.2d 613 (1963).

*Smith v. Shelby Ins. Co.* 936 S.W.2d 261, 263-64 (Tenn. Ct. App. 1996) (quoting *Gitter v. Tennessee Farmers Mut. Ins. Co.*, 60 Tenn.App. 698, 450 S.W.2d 780, 783 (1969)). The record contains no evidence that State Auto made any unconditional promises to fully pay Mr. Bishop's claim. Nor is there evidence of prejudicial reliance. *See id.; Robinson v. Tennessee Farmers Mut. Ins. Co.*, 857 S.W.2d 559, 563 (Tenn. Ct. App.1993) ("The burden of proof is on the insured to prove that a misrepresentation was made and that the insured reasonably relied upon the misrepresentation.").

## III.

Accordingly, the judgment of the trial court is affirmed. This case is remanded for such further proceedings as may be necessary. Costs of this appeal are to be taxed to Mr. Bishop for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

CONCUR:

_____
BEN H. CANTRELL,
PRESIDING JUDGE, (M. S.)

_____
WILLIAM C. KOCH, JR., JUDGE