58 N.J. Super. 483 (1959)
156 A.2d 725
PEARL ASSURANCE COMPANY, LIMITED, A CORPORATION, PLAINTIFF-APPELLANT,
v.
MILTON S. WATTS AND BERTHA D. WATTS, HIS WIFE; JESSIE F. GALLAGHER AND CHARLES GALLAGHER, HER HUSBAND, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 1959.
Decided December 16, 1959.
*486 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Neil F. Deighan, Jr. argued the cause for appellant (Messrs. Kisselman, Devine & Deighan, attorneys).
Mr. Lawrence N. Park argued the cause for respondents.
*487 The opinion of the court was delivered by HANEMAN, J.A.D.
Plaintiff Pearl Assurance Company, Limited brought a declaratory judgment action in the Chancery Division in order to obtain a determination of its rights in reference to a home owner's policy of insurance issued to defendants Milton S. and Bertha D. Watts, husband and wife, on January 31, 1957 for a coverage period of three years. The policy contained a "cooperation clause" calling for the assistance and cooperation of the insured whenever a question of liability under the policy might arise. Plaintiff contended that because of certain alleged inconsistent statements, Mr. and Mrs. Watts had breached the "cooperation clause" and, therefore, that it was not obligated to defend the negligence action instituted against the Wattses by defendants Charles and Jessie Gallagher, husband and wife, nor was it liable to the Gallaghers under the policy. From a judgment in favor of defendants, plaintiff appeals to this court.
Defendants Gallagher, mother and father of Bertha D. Watts, instituted an action against the defendants Watts on October 21, 1957 claiming injuries and damages suffered by Jessie F. Gallagher while descending a flight of steps located at the rear of the Watts' home, which had been purchased new about a year before the accident. They alleged negligence on the part of the Wattses in that they knew or should have known that the railing on said stairway was defective and that they failed to repair it. Plaintiff insurance company undertook the defense of the suit against defendants Wattses. On January 6, 1958 the Wattses appeared at the office of Kisselman, Devine & Deighan, attorneys for the insurance company, and answered inquiries in reference to the accident; a stenographic transcript was taken. As a part of his statement, Mr. Watts said:
"Q. Until the time of the accident did this handrail appear to you to be solidly anchored? A. To me it seemed anchored, yes.

* * * * * * * *
Q. And you yourself never noticed it was other than solidly anchored? A. No." *488 He further stated that his mother-in-law, Mrs. Gallagher, had probably used the railing prior to the accident, but that neither she nor anyone else had ever complained about its being shaky. Watts said that if there had been complaints he would have had the railing repaired, and that he did not inform the builder of any defects in said railing until after the accident. Finally, Mr. Watts related that he had told an insurance adjuster on September 16, 1957 that Mrs. Gallagher had retained an attorney to represent her and that she would probably institute suit against the builder. Mrs. Watts had been present during the interrogation of her husband, and when asked if she knew of anything that he did not bring out or if she knew of any circumstances that were different from what he had related, she replied in the negative. She did say, however, that she noticed that where the railing was connected to the house, there was a space for four screws and that only two had been inserted.
On April 11, 1958 the deposition of Mr. Watts was taken in the Gallagher action, at the instance of the Gallaghers. On that occasion Mr. Watts made the following answers:
"Q. And up until the day of the accident did the hand rail appear to be solidly anchored in the abutment? A. It never was actually what you would call solid. The one side was very solid but this opposite side never was right.
Q. Which side are you speaking of? A. Coming up it would be on your right side; going down, the left.
Q. That was anchored in the concrete, wasn't it? A. Yes, supposed to be.
Q. As far as you were able to observe, it seemed to be solidly anchored in the concrete? A. It never was right.
Q. What do you mean, it was never right? A. It was loose.
Q. What do you mean, it was loose? A. If you took hold of it it would move. That is not tight, to my estimation.
Q. Did it seem to be anchored? A. There was lead there, it was supposed to be anchored.
Q. I asked you did it seem to be anchored to the concrete abutment? A. Only respects looking at it [sic] it would be anchored, but actually it was loose.

* * * * * * * *
*489 Q. When did you first notice it wasn't solidly anchored? A. After I began to use it for a while.
Q. Speaking of your mother-in-law's accident, how long before did you yourself notice it wasn't solid? A. Several months before that.

* * * * * * * *
Q. Did you ever get down and look at it, Mr. Watts, before this accident? A. Certainly. What do you think I complained for?"
He stated that he had included the railing in question in a list of complaints that he had submitted to the builder before the accident. When asked if anyone had ever complained about the railing he replied: "Well, only the neighbors." Furthermore, on this occasion Mr. Watts testified that, to his knowledge, Mrs. Gallagher never used the railing before the day of the accident.
The deposition of Mrs. Watts was taken in connection with the present suit on October 10, 1958. She then testified that she and her husband had knowledge of the defective condition of the railing prior to the time of the accident, and that she believed that they had stated on January 6, 1958 that the railing was loose and not properly installed. Mr. Watts also testified at that time, and denied that he ever told the insurance adjuster that Mrs. Gallagher had hired an attorney. The following questions and answers ensued:
"Q. Suppose we go back to January 6th, 1958, you do recall that, when Mr. DeLuca was interrogating you? A. Yes, I remember when we came to the office here.
Q. Do you recall a question Mr. DeLuca asked you: `Until the time of the accident did this handrail appear to you to be solidly anchored?' and your answer: `To me it seemed anchored, yes.' Do you recall that answer? A. No.
Q. Do you recall a question asked by Mr. DeLuca: `Did anyone else make any complaint?'  referring to the railing  and your answer: `No, if they had we would have had it fixed.' Do you recall that? A. It is quite a ways back, I don't remember.
Q. Another question: `And you yourself never noticed it was other than solidly anchored? Answer: `No.' Do you recall that? A. I don't remember that.
Q. Another question: `Did you ask the builder to repair it?' Answer: `I told him about it.' You don't recall any of those *490 answers at all? A. I don't recall that there. It has been a long time between the two.
Q. Let me ask you this, Mr. Watts. If you gave answers that were different, what reason would you have for giving different answers as to your prior knowledge of the defective condition of this rail? A. It could be the way the questions were put.
Q. Did you have prior knowledge before August 5th, 1957, this railing was defective, or it wasn't put in properly, or it wasn't anchored properly? A. I knew it was loose.
Q. Do you have any knowledge why you told Mr. DeLuca that it was solidly anchored? A. The only way I know, the questions were put different, or something, but it was loose."
The trial court concluded that: Any allegation of collusion and fraud was abandoned at the hearing; it could not find inconsistencies in the Wattses' answers because exactly the same questions had not been put to them on each occasion; and issues of this type should be decided only after the insureds had testified at a trial. In a supplementary opinion the trial court found as a fact that Mrs. Watts had made no inconsistent statements.

I.
Cooperation clauses generally have been held to be material provisions of the policy and compliance therewith a condition precedent to the carrier's liability. 8 Appleman, Insurance Law and Practice, § 4771, p. 151 (1942); Bradford v. Commonwealth Casualty Co., 10 N.J. Misc. 301 (Sup. Ct. 1932). They are designed to protect the interests of the insurer and prevent collusion between the insured and the injured person. Kindervater v. Motorists Casualty Ins. Co., 120 N.J.L. 373, 376 (E. & A. 1938). In order to relieve the insurer of liability under the policy, the cooperation clause must be deliberately breached in a material or essential particular.
"Failure to co-operate on some inconsequential or immaterial matter cannot be set up as a defense, nor can it hardly be a ground for a defense where an insured makes on honest mistake."
*491 Bradford v. Commonwealth Casualty Co., supra, 10 N.J. Misc., at pages 306, 307. Cooperation and assistance of the insured requires a fair, frank and truthful disclosure of information reasonably demanded by the insurer for the purpose of enabling it to determine whether or not there is a genuine defense. 8 Appleman, op. cit., § 4774, p. 159. Hence, a deliberate falsehood to the insurance company by the insured, on a subject material to the assured's liability to a claimant as to the company's defense of such a claim, would constitute a breach of the cooperation clause.
Despite early New Jersey authority to the contrary, see Rockmiss v. New Jersey Mfrs.' Ass'n Fire Ins. Co., 112 N.J.L. 136 (E. & A. 1934) and Petersen v. Preferred Accident Ins. Co., 114 N.J.L. 180 (E. & A. 1935), the present state of the law is to the effect that a breach of a cooperation clause relieves the insurer from policy liability regardless of whether actual prejudice to the insurer has ensued therefrom. Kindervater v. Motorists Casualty Ins. Co., supra; Whittle v. Associated Indemnity Corp., 130 N.J.L. 576 (E. & A. 1943); Bankers Indemnity Ins. Co. v. A.E.A. Co., 32 N.J. Super. 471 (App. Div. 1954); 8 Appleman, op. cit., § 4773, p. 158. As the court tersely stated in the Kindervater case, supra, 120 N.J.L., at page 377:
"An interpretation that would require a demonstration of substantial detriment to the insurer, as the result of the breach of such a condition, would seriously impair its practical efficacy. It suffices if the condition has been breached in a material or essential particular."
Interestingly, both the Rockmiss case, supra, and the Kindervater case, supra, were written by the same justice.
In the Rockmiss case, supra, 112 N.J.L., at page 142, Justice Heher had stated:
"The proofs indisputably show that the insured substantially complied with the stated conditions of the policies, and that, in any event, the delay in advising the insurers of the facts did not *492 result in the substantial impairment of any of their policy rights, or any detriment or injury, and therefore, will not be permitted to work a forfeiture." (Emphasis supplied)
In that case, the insured had made inconsistent statements to the insurance company in reference to the speed at which he was traveling at the time of an automobile accident in which he was involved. The admittedly false statement was corrected by the insured before trial, and he explained that his first statement was prompted by a desire to avoid difficulty with the motor vehicle department. The insured, unlike the Watts in the case sub judice, was never accused of collusion with the injured party in an attempt to impose a fraudulent claim upon the insurer. Again, unlike the instant case, there was no contention that it was the second statement that was tainted with falsity.
In Kindervater, supra, the insured had admitted liability for an automobile accident in which he was involved. The question before the court was whether he had thereby breached the provision of his policy requiring him to render to the insurer "all co-operation within his power" and not to "voluntarily assume any liability, settle any claim * * * without the consent of the Company * * *." The court held that a violation of either of the above clauses would relieve the insurer from liability regardless of whether actual prejudice had ensued therefrom, and stated, 120 N.J.L., at page 378:
"The terms of the contract, as understood by a person of reasonable intelligence, measure the insurer's obligation; and there can be no recovery, in the absence of the elements of estoppel or waiver, where the assured has breached in matters of substance a reasonable protective provision made the determinative of liability. This regulation of the assured's conduct is essentially reasonable. Without these protective provisions, the insurer would be at the mercy of dishonest and culpably indifferent policy holders, for thereby it would run the risk of impoverishment to the detriment of honest claimants. Neither the public nor private interest is served by laxity in this regard."
*493 In Whittle v. Associated Indemnity Corp., supra, the driver of the insured vehicle disappeared immediately after the accident and his whereabouts were unknown even to his family until approximately two months thereafter. Even though the father of the driver, the named assured, notified the insurer of the accident the day after its occurrence, the court held that the cooperation provisions of the policy had not been sufficiently complied with, and that the insurer was not liable. The assistance and cooperation of the father, at best, merely satisfied the requirement of giving notice. As the court stated, 130 N.J.L., at pages 580, 581:
"Appellant was entitled, under the policy, to have from its assured, as soon as practicable after the accident, all of the prescribed information available to its assured concerning the accident. * * *
And if the test were that it must be shown that the failure to fulfill the conditions precedent prejudiced the insurer, the trial judge might well have been justified, under the proofs, in submitting the case to the jury. But that is not the test. The test is: Was a condition precedent of the policy unfulfilled by the assured? If it was then, if the insurer so chooses and it did so choose, the policy is at an end * * *." (Emphasis supplied)
Plaintiff disputes the finding of the trial court that the charge of fraud and collusion had been abandoned. There is nothing in the record presented to this court that would substantiate the trial court's finding that the plaintiff's claim of fraud and collusion had been abandoned at the hearing. If the insured, by fraudulent and collusive conduct, appears to be assisting the injured party in its claim against the insurance company, the cooperation clause will be deemed to have been violated. 8 Appleman, op. cit., § 4779, p. 167. The single fact that the injured party is a member of the insured's family and that their friendly relationship continued after the accident does not of itself furnish evidence of fraud and collusion, but, nevertheless, where members of the same family are involved, the evidence should be examined with great particularity. 8 Appleman, op. cit., § 4778, p. 166.
*494 After careful examination of the statements made by Mr. Watts, we conclude that several of his answers given on April 11, 1958 were inconsistent with those given on January 6, 1958, and that the questions put to him on those occasions were not so different that they should have resulted in such inconsistencies. Up to the time of the present suit, however, Mrs. Watts had only made one statement, and that was on January 6, 1958. Although she subsequently did contradict herself in the deposition taken on October 10, 1958 in connection with the present declaratory judgment suit, she could not have made any inconsistent statements before that time. Since a cause of action must exist before a complaint is filed we therefore affirm the judgment of the trial court as to Mrs. Watts.
We disagree with the trial court, however, in its conclusion that questions of the type involved herein should be decided only after the insureds have testified at trial. Plaintiff logically and correctly argues that there is no need to delay a declaratory judgment disposing of the questions presented. There is no reason to put an insurance company to the expense of a trial when it might be within its rights in refusing to defend an insured.
The inconsistent statements of Mr. Watts were on a material subject, since
"[I]f the occupier knows of some artificial or natural condition on the premises and, in the exercise of reasonable foresight, should realize that it involves an unreasonable risk to a licensee, then he is under a duty to take reasonable care to make the condition safe or to give a warning of its presence and of the extent of the risk involved." Mistretta v. Alessi, 45 N.J. Super. 176 (App. Div. 1957).
The first story of Mr. Watts would tend to absolve him of any liability for Mrs. Gallagher's accident, while his second version would lead to the conclusion that he had been negligent.
We therefore reverse and remand to the trial court so that the trier of the facts, who has had the opportunity *495 to see and hear the witnesses, can specifically rule whether or not Mr. Watts deliberately made inconsistent statements. Significantly, it is still not settled which of the Watts' statements presents a true picture of the facts involved in Mrs. Gallagher's accident. The trial judge must also decide whether or not Mr. Watts has been guilty of fraudulently aiding and assisting the Gallaghers in their negligence action. If the trial court finds either that Mr. Watts deliberately made inconsistent statements, or that he was guilty of fraud and collusion, he has breached the cooperation clause of the policy of insurance and the plaintiff is thereby absolved of liability thereunder.
Reversed and remanded for further proceedings in conformity with this opinion.