**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1717-24

ACME MARKETS, INC.,

    Plaintiff-Respondent,

v.

BAYSHORE MALL 1A, LLC,
BAYSHORE MALL 1B, LLC,
and BAYSHORE MALL 2, LLC,

    Defendants-Appellants.

_____

Submitted March 4, 2026 – Decided April 1, 2026

Before Judges Mayer and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0028-24.

David Larry Braverman (Braverman Kaskey PC) and Kevin W. Burdett (Braverman Kaskey PC), attorneys for appellants.

Cooper Levenson and Buchanan Ingersoll & Rooney PC, attorneys for respondent (Mark A. Kasten, Gerald E. Burns (Buchanan Ingersoll & Rooney PC) of the Pennsylvania bar, admitted pro hac vice, and Nicholas F. Talvacchia, on the brief).

PER CURIAM

Defendants Bayshore Mall 1A, LLC, Bayshore Mall 1B, LLC, and Bayshore Mall 2, LLC (collectively, Bayshore) appeal from an April 5, 2017 order granting partial summary judgment to plaintiff Acme Markets, Inc. (Acme), an August 28, 2017 order partially granting Bayshore's motion for injunctive relief and reconsideration of certain provisions in the April 2017 order, and a November 22, 2024 order granting summary judgment in favor of Acme and partial summary judgment in favor of Bayshore. We affirm all orders on appeal.

For ten years, Bayshore and Acme have litigated provisions in a 1988 written lease executed by their respective predecessors-in-interest (Lease).[1] Under the Lease, Acme's predecessor paid over one million dollars for a ninety-nine-year lease for a total of sixty-three acres of land owned by Bayshore's predecessor. The lease also gave Acme the option to purchase the leased property after obtaining subdivision approval from the municipality.

The main issue is Acme's right to subdivide its leased property from the larger shopping center property owned by Bayshore. There are subsidiary issues

---

[1] Because the municipality's subdivision ordinances at the time of the lease prevented the outright conveyance of property owned by Bayshore's predecessor, the parties could not enter into a sale agreement.

between the parties, including Acme's purported breach of the Lease and other Lease related documents.

The Lease refers to a written declaration of restrictions and grants of easements (Declaration) to which Acme and Bayshore are bound. Exhibit A purportedly attached to the Lease was a site plan[2] and Exhibit B attached to the Lease was a metes and bounds description.[3] Both exhibits were prepared by an engineering firm prior to any construction. These documents purportedly indicated the exhibits could contain discrepancies upon completion of construction.

The Declaration governed the location for the sale of merchandise within the shopping center. Bayshore claimed Acme violated the Declaration by selling merchandise within designated common areas and sidewalks without Bayshore's written consent. The Declaration also included an easement allowing a two-foot encroachment on space between the property leased to Acme and the remaining property owned by Bayshore. However, the Declaration states the easement does "not extend to encroachments which are intentional or which materially

---

[2] Bayshore contends Exhibit A was never attached to the Lease.

[3] Bayshore argued the metes and bounds description did "not form a mathematically closed figure," rendering Exhibit B ineffective.

A-1717-24

and adversely affect the location, orientation, design or construction of buildings to be constructed . . . unless first approved in writing by the [o]wner of the adversely affected [p]arcel."

The Lease provides Bayshore is required to cooperate with and assist Acme in obtaining subdivision approval, including the execution of documents necessary to obtain that approval. Further, the Lease requires Acme to obtain an as-built survey before exercising its right to subdivide and to comply with all applicable laws and regulations governing the subdivision of its leased property.

Despite the cooperation clause in the Lease, Bayshore opposed Acme's efforts to subdivide on several grounds. Among those grounds, Bayshore cited Acme's alleged breaches of the Lease, Acme's failure to provide an accurate as-built survey, and Acme's need to acquire variances as part of its subdivision application.

Acme attempted to work with Bayshore on the subdivision application and forwarded a consent form to be signed by Bayshore as the owner of the larger shopping center property. However, Bayshore declined to sign the owner's consent form as written. Bayshore claimed the owner's consent form was "overbroad." Bayshore further contended its professionals had to review Acme's plans before it would execute the owner's consent form. Additionally, Bayshore

4

argued Acme failed to provide a survey depicting the subdivision boundaries. In declining to sign the owner's consent form, Bayshore highlighted Acme's alleged noncompliance with various provisions in the Lease and Declaration.

In 2016, as a result of Bayshore's conduct, Acme filed an action in the Superior Court of New Jersey, Chancery Division, to compel Bayshore's compliance with the Lease (first action). Bayshore filed an answer and counterclaim. In its counterclaim, Bayshore sought to invalidate Acme's subdivision plan.

Acme moved for summary judgment in the first action. Judge Julio Mendez partially granted Acme's motion in an April 5, 2017 order and written statement of reasons. The judge upheld Acme's purchase option and right to obtain a subdivision. He also found Bayshore had a "duty to cooperate [with] and assist Acme in subdividing the premises."

Judge Mendez found "the [g]overning [d]ocuments [we]re crystal clear and provide[d] Acme with the right to exercise the purchase option" and "Acme's purchase option [was] valid and enforceable." Further, the judge stated that "[w]hile the parcel Acme s[ought] to subdivide [wa]s inconsistently identified in the [g]overning [d]ocuments," he was "satisfied that[,] without a doubt[,] the parcel c[ould] be identified[,] . . . find[ing] adequate proof that Exhibit A [wa]s

5

recorded, enforceable, and identifie[d] Acme's parcel with reasonable certainty." While noting inconsistencies between Exhibit B and Acme's original subdivision plan, the judge accepted Acme's amended subdivision plan as revised per the land description in Exhibit B. The judge found "the metes and bounds of the [p]roperty, per Acme's recent modification, [wa]s consistent with the [g]overning [d]ocuments."

While the judge affirmed "Bayshore's obligation to cooperate [with] and assist Acme in furtherance of its subdivision," he held "Bayshore [wa]s not required to sign Acme's [s]ubdivision [p]lan and [o]wner's [c]onsent [f]orm." However, the judge rejected Bayshore's argument that it had "no duty to revise Acme's incorrect or overly broad documents," explaining "Bayshore must work diligently with Acme, which may include helping to correct inadvertent mistakes in its documents." The judge also rejected Bayshore's argument "that Acme require[d] government approval prior to obtaining Bayshore's cooperation and assistance" and "ha[d] no duty to cooperate and assist with any entity other than the Township and the County." To the contrary, the judge found Bayshore had a duty to cooperate and assist as needed "in furtherance of [Acme] obtaining approval of relevant government authorities."

A-1717-24

Regarding the owner's consent form, the judge concluded the form was "inaccurate and overbroad" because "[i]t sought the signature of only defendant Bayshore Mall 1A" while "Bayshore consists of three limited liability companies and the signature of Bayshore Mall 1A does not represent remaining owners." Additionally, the judge found the owner's consent form, requiring "Bayshore Mall 1A to authorize Acme to execute all documents and perform all acts related to Acme's application as though applied for by Bayshore," essentially "serve[d] as a kind of power of attorney, wholly unanticipated by the [g]overning [d]ocuments."

Judge Mendez also was "unconvinced with Bayshore's attempt to muddy the waters [by] noting Acme's improper and unauthorized work in common areas,[4] past due . . . payments, and violations of the Americans with Disability Act." The judge held "Bayshore may file separate actions seeking compliance with the law or money damages for these claims." However, the judge expressly stated "such claims d[id] not prevent Acme from exercising its purchase option

---

[4]  Acme repaved a portion of the parking lot and modified the drainage system. Bayshore claimed that Acme performed this work incorrectly and Bayshore had to remediate the issues at its own expense.

A-1717-24

rights under the [g]overning [d]ocuments or excuse Bayshore's duty to cooperate and assist."

Bayshore then moved for injunctive relief in the first action and for reconsideration of the April 7 order. Bayshore sought an injunction prohibiting: "(1) Acme's use of its sidewalk for storage and sales; (2) nonconforming signs on the outside of Acme's property; (3) Acme's request[s] for variance relief; (4) Lower Township's ability to consider Acme's variance request[s]; (5) Acme's ability to sell alcoholic beverages;[5] and (6) Acme's ability to pursue its subdivision application."

Bayshore sought injunctive relief, claiming Acme failed to adequately define the nature of its planned encroachments and that there were questions regarding the scope of permissible encroachments under the Declaration. Bayshore also argued the variances required by Acme for subdivision approval would "negatively impact the remainder of the shopping center" and therefore would "not [be in] full compliance with the terms of the [governing] documents."

---

[5] Pending discussions between Acme and the New Jersey Division of Alcoholic Beverage Control, Bayshore elected "not to proceed" on the liquor license issue.

In its motion for reconsideration, Bayshore claimed Judge Mendez should have permitted discovery before determining Bayshore's obligation to cooperate with Acme's subdivision application. It also argued discovery would have supported a finding that Acme breached the Lease and Declaration, rendering its obligation to cooperate null and void.

While the parties continued to litigate, Acme filed an application with the municipal planning board, requesting a variance to allow outdoor sales and signage. Bayshore opposed the application. The planning board denied Acme's variance application.

In an August 28, 2017 order and written decision, Judge Mendez partially granted Bayshore's motions for injunctive relief and reconsideration. The judge enjoined "Acme's use of its sidewalk for storage and sales" based on the planning board's denial of Acme's variance.

The judge also granted Bayshore's request to enjoin the "nonconforming signs on the outside of Acme's property" based on the planning board's denial of the variance application for outdoor signage. The judge enjoined "use of unauthorized signage until Acme obtain[ed] the proper municipal approvals."

However, Judge Mendez denied Bayshore's request to enjoin Acme's future application for variances. The judge concluded "Bayshore overreache[d]

in its attempt to usurp [the planning board's] authority and Acme's statutory rights pursuant to the Municipal Land Use Law."

The judge also denied Bayshore's request to enjoin Acme's pursuit of its subdivision application. The judge found no reason "to prevent Acme from filing a subdivision application" and stated "[t]he rights of Bayshore w[ould] be fully protected in the context of this litigation under the [g]overning [d]ocuments, as well as the hearings that will take place before the planning board."

The judge partially granted Bayshore's motion for reconsideration. While reaffirming Acme's right to purchase and subdivide its parcel from Bayshore's larger property, the judge allowed discovery related to the legal descriptions of Bayshore's property and Acme's proposed subdivision. Because Acme submitted a modified plan only a few days before the summary judgment hearing, Judge Mendez agreed Bayshore "had no opportunity to review the plan, challenge its details, or take discovery" on the modified plan. The judge limited discovery to "the proper description and property lines of the property to be subdivided" and detailed the specific discovery permitted as part of his order. The judge also allowed discovery as to whether Acme's encroachments exceeded the encroachment provision in the Declaration. Bayshore's other discovery

requests were denied by Judge Mendez for the detailed reasons explained in his written decision.[6]

Not long after Judge Mendez entered his August 28, 2027 order, Acme filed a revised application for variance relief with the planning board. Bayshore opposed the revised application. On December 14, 2017, the planning board approved Acme's variance application.

In January 2023, a newly assigned judge directed Acme to file its subdivision application with the planning board. The new judge closed the matter subject to the planning board's decision on Acme's application. After the planning board rendered a decision on Acme's application, the judge stated any remaining claims could be filed in a new action under a different docket number. Bayshore's remaining counterclaims in the first action were transferred to the Law Division.

Acme filed its subdivision application with the planning board. Bayshore signed the owner's consent form for Acme's subdivision plan but added the following language:

> [Bayshore] own[s] the lot as shown hereon. This
> application is being signed on behalf of [Bayshore]

---

[6] Discovery disputes ensued notwithstanding Judge Mendez's detailed discovery order. The disputes led to the appointment of a special discovery adjudicator. The parties' discovery disputes are not the subject of this appeal.

consenting only to Acme's right to file a subdivision application with the [p]lanning [b]oard. [Bayshore] does not consent to a subdivision pursuant to the subdivision plan dated September 18, 2019. . . . The September 18, 2019 plan attached is inaccurate and does not conform with the requirements of the possible subdivision contemplated or intended by the parties as set forth in Acme's 1988 Lease agreement.

The municipal engineer reviewed Acme's subdivision application. He "found deficiencies in the application and plan which would need to be corrected before the plan could be considered." The planning board advised it could not "hear the subdivision application as [Bayshore] ha[d] not consented to the subdivision based upon the submitted plan." Therefore, the planning board explained it could not consider Acme's application without full consent from Bayshore.

Upon transfer of Bayshore's remaining counterclaims to the Law Division under a new docket number, Acme obtained an order allowing it to file an amended complaint in that action. In its May 2023 amended complaint, Acme alleged Bayshore violated its obligations under the Lease by refusing to cooperate and assist with Acme's subdivision plan. It further alleged Bayshore breached the Lease by "overcharging Acme for Acme's share of real estate taxes payable under the Lease."

On September 19, 2023, Acme filed another complaint against Bayshore in the Superior Court of New Jersey, Chancery Division. Acme renewed its breach of contract and declaratory judgment claims raised in its May 2023 amended complaint in the Law Division matter. Acme specifically requested Bayshore be compelled to cooperate and assist Acme in securing all governmental approvals for its subdivision. Acme also requested compensatory damages and attorney's fees.

Bayshore moved to dismiss the new complaint, which the judge denied. Bayshore then filed its answer and counterclaim. Bayshore asked the court to declare it be allowed to "conduct reasonable due diligence on all future subdivision plans and withhold its consent when those plans do not comply with the law or the terms of the [g]overning [d]ocuments."

In February 2024, Judge Michael J. Blee consolidated the Chancery Division and Law Division cases under a single docket (second action). Acme then filed an answer to Bayshore's counterclaim in the second action.

Bayshore moved for partial summary judgment in the second action. The same day, Acme also moved for summary judgment in the second action. Judge Blee heard counsels' arguments in September 2024 and reserved decision. He

13

also suggested the parties attempt to resolve the issues "before [he] render[ed] [his] [o]pinion in thirty days."

Because the parties were unable to resolve their disputes, Judge Blee entered a November 22, 2024 order and issued a written decision. The judge granted Acme's motion for summary judgment and denied Bayshore's motion for partial summary judgment, except to rule in Bayshore's favor regarding Acme's real estate tax claim.

The judge granted summary judgment to Acme on its claim "that Bayshore breached the Lease by failing to cooperate with and assist Acme in obtaining subdivision approval." Judge Blee held Bayshore's argument that Acme's subdivision discrepancies prevented Bayshore from cooperating and assisting was "baseless." The judge cited Judge Mendez's April 2017 order requiring Bayshore "to correct inadvertent mistakes in [Acme's] documents" as part of Bayshore's duty to cooperate with and assist Acme in obtaining subdivision approval. Further, the judge determined Acme's requested variances associated with subdivision were "a way for an applicant to conform with the law" rather than, as Bayshore argued, an acknowledgement that Acme's plan did not conform with the law. The judge noted Bayshore's encroachment claims in its

ongoing dispute with Acme demonstrated "Bayshore ha[d] not attempted to cooperate with and assist Acme on what the proper line should be."

Judge Blee also found Acme was entitled to specific performance based on Bayshore's breaches under the Lease. The judge rejected Bayshore's argument that the discrepancies between Acme's subdivision plan and the land description barred Acme's claim for specific performance. The judge explained neither Acme's need for variances to effectuate its subdivision plan nor Acme's alleged encroachments on adjoining property owned by Bayshore impacted Bayshore's duty to cooperate with and assist Acme under the Lease.

In denying most of Bayshore's motion for partial summary judgment, Judge Blee held collateral estoppel did not bar Acme's claim that Bayshore failed to cooperate and assist Acme in its pursuit of subdivision because there was no final decision on the merits in the first action. Based on Judge Mendez's orders in the first action, Judge Blee found Bayshore's duty to cooperate and assist was not superseded by Bayshore's desire to conduct due diligence regarding Acme's subdivision plan. Additionally, the judge found there were genuine disputes of material fact as to Acme's breaches of the governing documents concerning outdoor sales and parking lot repairs.

15

However, regarding Acme's claim concerning the allocation of real estate taxes, the judge granted partial summary judgment to Bayshore, finding the Lease provision addressing payment of real estate taxes was ambiguous. Therefore, the judge concluded Bayshore did not breach the agreement by charging Acme fifty percent of the real estate taxes for the property leased by Acme.

Bayshore moved for reconsideration of Judge Blee's November 2024 order. Bayshore argued Acme's alleged breaches of the Lease should not have been resolved on summary judgment due to the existence of genuine issues of material fact regarding the scope and effect of Acme's breaches under the Lease. Regarding the order requiring it to cooperate with and assist Acme, Bayshore argued the judge unjustly expanded Bayshore's duty under the Lease. Bayshore further argued the order constituted an "advisory opinion" "contemplating a hypothetical future . . . plan that Acme [wa]s going to put together" and required Bayshore to sign the plan without allowing any due diligence into the viability of the plan. Additionally, Bayshore claimed the judge erred in requiring it to exhaust administrative remedies regarding certain of Acme's alleged breaches under the Lease.

A-1717-24

Judge Blee denied reconsideration, rejecting Bayshore's arguments predominately for the same reasons explained in his November 2024 written decision. As to Bayshore's claim that the order constituted an advisory opinion, Judge Blee explained "[t]he court [wa]s merely enforcing the plain language of the [L]ease and [was] not issuing an [a]dvisory [o]pinion."

On appeal, Bayshore argues the orders entered in favor of Acme should be vacated and it is entitled to summary judgment as a matter of law. Bayshore contends Acme's alleged breaches of the Lease were sufficiently material to preclude Acme's subdivision application. Bayshore further argues the orders entered in favor of Acme improperly expanded the cooperation clause under the Lease and imposed additional obligations on it that were not contemplated under the Lease. Additionally, Bayshore contends the November 2024 order constituted an improper advisory opinion because it contemplated hypothetical future interactions between Acme and Bayshore as part of the subdivision process. Bayshore also argues the November 2024 order improperly required Bayshore to exhaust its administrative remedies regarding Acme's alleged land use violations before pursuing its breach of contract claims. We reject Bayshore's arguments.

17

Under Rule 4:46-2(c), a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." In reviewing a motion for summary judgment, the judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 540 (1995). We review a trial judge's grant of a motion for summary judgment de novo, applying the same standard used by the trial court. Stewart v. N.J. Tpk. Auth./Garden State Parkway, 249 N.J. 642, 655 (2022).

"The interpretation and construction of a contract is a matter of law for the trial court, subject to de novo review on appeal." Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016) (citing Fastenberg v. Prudential Insurance Co. of America, 309 N.J. Super. 415, 420 (App. Div. 1998)). A lease is a contract setting forth the parties' rights and obligations. See Town of Kearny v. Discount City of Old Bridge, Inc., 205 N.J. 386, 411 (2011).

We first consider whether the judge erred in granting summary judgment in favor of Acme by requiring Bayshore to perform its cooperation and assistance obligations under the Lease.

To establish a right to specific performance of the terms of a contract, the party seeking such performance must demonstrate (1) the contract is valid and enforceable, (2) the terms of the contract are clearly express the duties and obligations of each party, and (3) an order compelling performance of the contract would be just. Marioni v. 94 Broadway, Inc., 374 N.J. Super. 588, 598-99 (App. Div. 2005) (citations omitted). However, "one who has either broken a promise in some material respect or is unable substantially to perform his own obligations under an agreement cannot get a decree for specific performance." In re Hoffman, 63 N.J. 69, 81 (1973). "[A] breach is material if it 'goes to the essence of the contract.'" Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (quoting Ross Systems v. Linden Dari–Delite, Inc., 35 N.J. 329, 341 (1961)).

To determine whether a breach is material, the court must consider:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

A-1717-24

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and]

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

[Id. at 175 (alteration in original) (quoting Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981)).]

Bayshore argues both judges disregarded Acme's breaches of the Lease in ordering Bayshore's specific performance. Bayshore contends Acme committed the following acts constituting breaches under the Lease, thereby precluding specific performance: Acme's failure to provide an as-built survey; Acme's encroachments onto Bayshore's property; Acme's need to obtain variances for its subdivision; and Acme's 2010 damage to the parking lot.

Regarding Acme's alleged breach of the Lease by failing to provide an as-built survey, we agree with Judge Blee that "the issue with obtaining a survey or whether there [wa]s a flawed description . . . turn[ed] on Bayshore's affirmative duty to cooperate and assist Acme with the [s]ubdivision." Because Bayshore obstructed Acme's pursuit of subdivision, Acme has been unable to exercise its purchase option under the Lease for which Acme paid significant

20

monetary consideration. Under the Lease, Bayshore must cooperate with and assist Acme in obtaining the survey so Acme can subdivide and exercise its purchase option. Due to Bayshore's failing to cooperate and work with Acme to obtain all necessary approvals, Acme has not yet breached the Lease by failing to meet the as-built survey condition precedent.

Regarding Acme's alleged encroachments on Bayshore's adjoining property, we agree that the purported encroachments do not constitute a material breach of the Declaration. Bayshore argues "[t]he Declaration prevented any encroachment unless that encroachment was unintentional and less than two feet." Bayshore asserts Acme's encroachments were intentional and therefore constituted a breach under the Declaration. Bayshore further contends the encroachment is material because it prevents Bayshore from expanding its store.

However, as Judge Mendez found, "Acme offered to subdivide either along the metes and bounds description in the Lease or along the as-built party wall line" which would resolve the encroachment issue. However, Bayshore rejected that proposal. Judges Mendez and Blee concluded Acme's subdivision would not negatively affect Bayshore's property because the Declaration grants each party "an easement for any portion of any building or structure on any

[p]arcel . . . provided that any such encroachment provided herein shall not exceed two . . . feet."

Even if Acme's purported encroachment constituted a breach of the Declaration, any encroachment did not constitute a material breach precluding Acme's right to seek subdivision. Judge Blee specifically found "that even if minor encroachments exist[ed], there [we]re other ways to deal with the issue than denying Acme its rights under the Lease." For example, Bayshore could file a separate action seeking compensation for any encroachment limiting Bayshore's right to expand its building. Or, alternatively, Bayshore could work with Acme to create plans meeting Bayshore's specifications to allow an expansion of Bayshore's existing structure. Thus, we are satisfied the judges did not err in finding Acme's alleged encroachment was not a material breach of the Declaration to justify Bayshore's refusal to cooperate and assist Acme with its application for subdivision approval.

Nor does Acme's need for variances as part of its subdivision application obviate Bayshore's compliance with the Lease. Bayshore argues Acme's need to obtain variances for its subdivision plan violates the Lease. According to Bayshore, "[a] use variance, as the term implies, permits a use of land that is otherwise prohibited by the zoning ordinance." Nuckel v. Borough of Little

22

Ferry Planning Board, 208 N.J. 95, 101 (2011) (citing Coventry Square, Inc. v. Westwood Zoning Bd. of Adjustment, 138 N.J. 285, 287 (1994)). Because Acme requires variances, Bayshore claims Acme's subdivision application does not fully comply with the law and, therefore, constitutes a breach of the Lease.

In rejecting Bayshore's argument, Judge Blee found Acme's required variances were "a way for [Acme] to conform with the law" rather than an acknowledgement that Acme's plan did not conform with the law. See Stop & Shop Supermarket Co. v. Bd. of Adjustment of Twp. of Springfield, 162 N.J. 418, 432 (2000) ("A variance . . . is an official quasi-legislative, quasi-judicial determination that the use or structure allowed is not offensive to the ordinance in the broad context of the particular circumstances which . . . have authorized the grant. In essence, the use or structure allowed becomes a conforming use.") (emphasis removed) (citing 2 Rathkopf, The Law of Planning and Zoning § 46:1 (3d ed. 1972)). Therefore, Bayshore's argument that variances imply violations of the law is misplaced.

Even adopting Bayshore's narrow interpretation of the term "variance," Judge Mendez found none of Bayshore's land-use arguments "invalidate[d] Acme's purchase option" because "[q]uestions of land use [we]re best left to the local board." Nothing about Acme's variance requests deprived Bayshore of any

23

reasonably expected material benefits. Nor would Bayshore be precluded from bringing an action for compensatory damages against Acme if any of the granted variances resulted in harm to Bayshore. Therefore, despite the need for variance relief, Acme's subdivision plan did not constitute a material breach of the Lease.

We also reject Bayshore's argument that Acme's alleged damage to the parking lot constituted a breach of the Lease thereby voiding Bayshore's obligations under the governing documents. Bayshore argues the judge erred in finding its allegation that Acme caused damage to the parking lot unsupported by the record.

Judge Blee found "Bayshore ha[d] not provided any supporting evidence that Acme performed such work." The judge explained "Bayshore merely support[ed] [its] contention with testimony from its principal." On appeal, Bayshore now claims Judge Blee "overlook[ed] the undisputed deposition testimony of Acme's representative who admit[ted] to performing repair work on the parking lot and resolving the issue in Acme's favor."

Bayshore failed to cite where in the record Acme made such statements about the parking lot. Moreover, in resolving this issue, Judge Blee acknowledged his obligation to consider Bayshore's arguments "in the light most favorable to the non-moving party," citing Brill, 142 N.J. at 540, and Acme was

24

the non-moving party. Thus, Judge Blee did not err in concluding Bayshore's parking lot claim was not supported by the record and properly denied Bayshore's motion for summary judgment on this issue.

We next consider Bayshore's argument the judges erred by expanding its duty to cooperate and assist under the Lease. Bayshore challenges the judges' interpretation of the Lease, imposing "affirmative obligations" upon Bayshore under the Lease. Bayshore argues its obligations under the cooperate and assist provision of the Lease are limited to "only cooperat[ing] [with] and assist[ing] [Acme] with the subdivision application process" and specifically limits Bayshore's obligation to helping Acme "in seeking the issuance of approvals." Bayshore asserts the judges "effectively g[ave] Acme a blank check to take from Bayshore whatever it claims it need[ed] in the name of subdivision." We disagree.

The relevant portion of the Lease obligates Bayshore to "cooperate with and assist [Acme] in securing the said approval of all governmental authorities" such as "timely execut[ing] any applications and other necessary documents that [Acme] certifies to [Bayshore] are necessary to effect the [s]ubdivision of the [p]remises and to attend[,] upon reasonable notice[,] any necessary public or private hearings in seeking [s]ubdivision approval." Judge Mendez concluded

Bayshore had an obligation based on this language "to support Acme's endeavor to exercise its valid and enforceable purchase option" by "work[ing] diligently with Acme, which may include helping to correct inadvertent mistakes in its documents." Additionally, Judge Mendez determined Acme's requests directed to Bayshore and related to the subdivision plan were "reasonable and [Acme] welcomed Bayshore's comments on the matter." Judge Blee adopted Judge Mendez's findings related to the cooperation and assist provision in the Lease.

We discern no error in Judge Mendez's conclusion regarding Bayshore's duty to cooperate and assist under the Lease. The Lease unequivocally required Bayshore to cooperate with and assist Acme in that endeavor.

The Lease states Bayshore is required to "execute any applications and other necessary documents" related to Acme's subdivision plan. We agree Bayshore may not refuse to sign Acme's documents based on a purported inaccuracy. In the event Bayshore declines to execute documents submitted by Acme, the Lease provides Bayshore must work with Acme to conform the documents and render them acceptable for execution by Bayshore. On this record, we are satisfied Judge Mendez did not err in concluding Bayshore may be required to assist Acme in "correct[ing] inadvertent mistakes in its documents" because Bayshore must execute the documents in connection with

26

Acme's subdivision and, presumably, Bayshore would want to sign legally correct documents. The plain language of the Lease obligates Bayshore to work with Acme to cure any subdivision plan deficiencies, which may include some "affirmative" activity on Bayshore's part.

Bayshore mistakenly relies on cases discussing cooperation clauses in insurance policies as evidence that such provisions should be construed narrowly. See Selective Insurance Co. of America v. Hudson East Pain Management Osteopathic Medicine, 210 N.J. 597, 607 (2012) (finding that, according to the insurance policy at issue, "an insured's duty to cooperate with [their carrier] referred to the duty to cooperate with the 'investigation, settlement or defenses' of the insured's underlying claim" and therefore "[a]n insured had no duty to provide information to [the carrier] with respect to the ownership structure, billing practices, or referral methods of the medical providers from whom he or she sought treatment for his or her injuries.").

We conclude cooperation clauses in the context of insurance policies are inapplicable to the cooperation clause in the Lease because Bayshore and Acme are not insurance carriers or insureds. See Pearl Assurance Co. v. Watts, 58 N.J. Super. 483, 490 (App. Div. 1959) (explaining that cooperation clauses "are designed to protect the interests of the insurer and prevent collusion between the

insured and the injured person") (citing <u>Kindervater v. Motorists Casualty Insurance Co.</u>, 120 N.J.L. 373, 376 (E. & A. 1938)). Therefore, Bayshore's reliance on <u>Hudson East Pain Management</u> is misplaced.

Bayshore also asserts it "has cooperated with Acme to achieve a subdivision that is in accordance with the [g]overning [d]ocuments and applicable law." Alternatively, Bayshore claims "Acme seemingly does not want Bayshore to work with it as a partner," instead "demand[ing] that Bayshore work for it as a blind and mute subordinate." Bayshore further contends that "obligations under a cooperation clause are reciprocal" and therefore Bayshore cannot be in violation of the Lease's cooperation provision due to Acme's failure to abide by such provision. Bayshore cites Acme's purported breaches of the Lease, such as Acme's failure to provide an as-built survey, need for variances to effectuate its subdivision plan, land description issues, and encroachments onto Bayshore's property, as evidence Acme failed to cooperate with Bayshore. Thus, Bayshore argues "Acme is not entitled to equitable relief as the balances do not weigh in its favor" due to Acme's "unreasonable conduct."

As we previously explained, none of Acme's alleged breaches are material and thus do not warrant Bayshore's refusal to cooperate and assist with Acme's subdivision application. Additionally, while obligations under the Lease's

cooperation clause may be reciprocal, none of Acme's conduct could be deemed "unreasonable" regarding its relationship with Bayshore. Acme sought Bayshore's assistance and feedback at every stage of the subdivision process and expressed its willingness to cure issues Bayshore may have had with its subdivision plan. Further, Acme's purported breaches of the Lease do not constitute violations of the cooperation provisions. On this record, Acme has done nothing but attempt to cooperate with and solicit assistance from Bayshore to obtain subdivision.

We also reject Bayshore's argument that Judge Blee's November 2024 order constituted an advisory opinion. "An advisory opinion is a nonbinding statement by a court . . . interpreting the law on a matter submitted for that purpose." In re Determination by Dir. of Div. of Alcoholic Beverage Control that Xanadu Redevelopment Project Meets All Jurisdictional Requirements, 392 N.J. Super. 577, 580 (App. Div. 2007). "[C]ourts in New Jersey do 'not render advisory opinions or function in the abstract.'" Id. at 581 (citing Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107 (1971)).

Bayshore argues Judge Blee's November 2024 order is an advisory opinion because the order addresses "a hypothetical plan that Acme might put together in the future." Bayshore argues it "must be allowed to ensure that any

29

plan or document submitted by Acme complies with the [g]overning [d]ocuments so that both parties get the exact deal that was negotiated."

Nothing in Judge Blee's November 2024 order constituted an advisory opinion. Judge Blee quoted the language in the Lease. The quoted language is not a "nonbinding statement" because Acme and Bayshore are already mutually bound by the terms of the Lease. Judge Blee's order enforces the plain language of the Lease and does not address hypothetical future interactions between Acme and Bayshore. Acme and Bayshore agreed their future conduct is governed by the terms of the Lease. Judge Blee's November 2024 merely enforced the Lease obligations and did not constitute an advisory opinion.

Bayshore also argues Judge Blee erred by requiring Bayshore to exhaust its administrative remedies before asserting claims for breach of contract against Acme. We reject this argument.

"Rule 4:69-5 imposes a duty to exhaust administrative remedies before initiating actions at law '[e]xcept where it is manifest that the interest of justice requires otherwise.'" Griepenburg v. Twp. of Ocean, 220 N.J. 239, 261 (2015) (alteration in original). "[T]he exhaustion of remedies requirement is a rule of practice designed to allow administrative bodies to perform their statutory functions in an orderly manner without preliminary interference from the

courts." Ibid. (quoting Brunetti v. Borough of New Milford, 68 N.J. 576, 588 (1975)). "[T]here is 'a strong presumption favoring the requirement of exhaustion of remedies.'" Ibid. (quoting Brunetti, 68 N.J. at 588). The need for an exhaustion of administrative remedies may be superseded "when the administrative remedies would be futile, when irreparable harm would result, when jurisdiction of the agency is doubtful, or when an overriding public interest calls for a prompt judicial decision." Ibid. (quoting New Jersey Civil Service Ass'n v. State, 88 N.J. 605, 613 (1982)).

Here, Judge Blee ordered Bayshore to "exhaust all administrative remedies, including seeking code enforcement, for the outdoor sales and parking lot ponding issues" rather than address those issues in the second action. Judge Blee relied on the earlier decision by Judge Mendez that "[q]uestions of land use [we]re best left to the local board of adjustment."

Contrary to Bayshore's argument on this point, the issues regarding outdoor sales and damage to the parking lot would fall under the Lease if Acme failed to "comply promptly and fully with all laws, ordinances, notices, orders, regulations[,] and requirements of all federal, state[,] and municipal governments and all departments, commissions, boards[,] and offices thereof." Thus, Bayshore must establish Acme's outdoor sales practices and parking lot

31

ponding repair violated the law. And, to prove Acme violated the law, Bayshore must exhaust its administrative remedies, such as pursuing an action before the local code enforcement board or local planning board.

There is no evidence on this record that such actions by Bayshore would be futile or would result in irreparable harm. Nor does the public interest call for a judicial decision on these issues. Because establishing Acme conducted illegal land-use activity is a condition precedent to establishing Acme breached the Lease, Judge Blee did not err by requiring Bayshore to pursue administrative remedies before asserting a breach of contract claim on such grounds.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1717-24